## Ash *against* Ashton.

When lands were actually confiscated because of the treason of their owners,
in pursuance of the Act of 6th March 1778, there is no legal presumption that
the traitor returned and surrendered himself according to the requisitions of the
proclamation of the 8th of May 1778.  If he did, it is the subject of proof.

Lands thus confiscated were not restored by the treaty of peace, but the title
of the commonwealth remained.

The 3d section of the Act of 3d of April 1804, and the Act of 13th of March
1815, are to be construed as being *in pari materiâ*, and to limit the right of
action by the owner of unseated land against a purchaser to five years.

ERROR to the Common Pleas of *Columbia* county.

This was an action of ejectment brought by Albert B. Ashton
and Alfred R. Ashton, by their next friend John R. Ashton, and
Isaac S. Ashton, John R. Ashton, Samuel R. Ashton and Augus-
tus Ashton against Christian Ash and Jacob Ash, to recover a
tract of land containing 247 acres 49 perches.  Both parties de-
rived their respective claims to the land from a warrant in the
name of Robert Wilson, dated the 26th of January 1774, a sur-
vey made in pursuance thereof, and a patent founded on the same
to Alexander Bartram, dated 29th of March 1775, reciting a deed
of conveyance from Robert Wilson, dated 27th of January 1774.

The plaintiffs, to establish their right to the land, offered, first,
to show by a proclamation of the Supreme Executive Council of
the State, issued the 8th of May 1778, in pursuance of the 3d sec-
tion of the Act of the 6th of March 1778, that Alexander Bartram
was attainted of high treason, having failed to render himself as
therein required, and abide his legal trial for the treason thereby
charged against him; that by reason thereof his right to the land

[Ash v. Ashton.]

became forfeited, and his title thereto vested in the State; that the State afterwards by deed, dated 24th of March 1787, and executed by Charles Biddle, Vice-President, on behalf of the State, after reciting the proclamation and the failure of Bartram to render himself and abide his trial, by reason whereof and by force of the Act of Assembly aforesaid, he was attainted of high treason, and all his estate, real and personal, within the State was forfeited to its use, &c.; and that the 'agents for the State for the sale of confiscated estates in the county of Northumberland, having previously given due and legal notice of the day and place of sale, on the 28th of February 1787, sold the land at public sale, at the court-house in Sunbury, to Alexander Power for £51, in consideration whereof, and of the payment of the £51 by Power, did grant, bargain and sell the land in fee to him. A certified copy also from the minutes of the Supreme Executive Council was included in the offer, showing that Charles Biddle was Vice-President of the same at the time, and that he executed such deed of conveyance on behalf of the State.

The defendants objected to this evidence, but the court overruled the objection and admitted the evidence; the defendants excepted. This exception was made the ground of the first error.

The plaintiffs then gave in evidence a regular chain of title by deeds of conveyance from Power down to Samuel Ashton, of whom the plaintiffs were the heirs at law.

The defendants claimed under a sale and conveyance of the land by the county treasurer for taxes, assessed in 1814, 1815 and 1816; and after proving an assessment made upon it as unseated in 1814, offered a deed of conveyance, dated the 15th of November 1816, from James Loughead, county treasurer, to Daniel Montgomery. This was objected to by the plaintiffs. The defendants then gave evidence of an assessment made on the land as unseated for the year 1820, amounting to $5.66, and offered in evidence another deed, dated the 5th of August 1822, from William Wilson, county treasurer, to John C. Boyd, in connexion with the first treasurer's deed, and a regular succession of deeds of conveyance from the vendees of the two treasurers down to the defendants; with evidence also showing that they had been in possession of the land under these deeds more than five years, and had made improvements thereon of great value. It being understood that no bond had been given by the purchasers at either of those treasurer's sales for the surplus money after paying the taxes and costs accrued thereon, this evidence was offered for the purpose of showing in the first place, that the defendants, though no such bonds had been given, had acquired a right to the land by virtue of their possession for five years, under the clause in the 3d section of the Act of the 3d April 1804, (4 *Smith's L.* 202), directing the mode of selling unseated lands for taxes, which declares that "no action for recovery of said lands shall lie, unless the

[Ash v. Ashton.]

same be brought within five years after the sale thereof for taxes as aforesaid." And in the second place, if they were not entitled to hold the land, that they might have the value of their improvements ascertained by the jury, and paid by the plaintiffs agreeably to another clause in the proviso to the same section, providing "where a recovery is effected, that in such cases the value of the improvements made on the lands after the sale thereof for taxes, shall be ascertained by the jury trying the action for recovery, and paid by the person or persons recovering the same before he, she or they shall obtain possession of the lands so recovered." This evidence was objected to by the plaintiffs, and the court overruled it. To the opinion of the court the defendants took exception, which is the basis of the second error assigned.

*Comly* and *Montgomery,* for plaintiffs in error. The Act of 1778 requires that a registry should be made of those who had not surrendered themselves at the end of forty days. No such registry was shown here, and the reasonable presumption, therefore, was, that there was a surrender. The Act also requires that a certified copy should be furnished to the Judges of the Supreme Court, and forwarded to the sheriff of the county where the lands lie. Now as the plaintiffs rely upon a forfeiture for a criminal offence, certainly they are bound to show that the law, in all its requisitions, was complied with. 13 *Serg. & Rawle* 208; 10 *Watts* 469. It does not appear that the commonwealth had done any act to consummate the forfeiture before the treaty of peace; a fair interpretation of that Act, then, should relieve the land from the forfeiture.

The defendants are clearly protected in their possession by the 3d section of the Act of 1804, (4 *Smith's Laws* 202); but it is said this Act is repealed by that of 1815. There is no repealing clause, and it cannot be shown how they are inconsistent with each other. A sale under the Act of 1815, without a surplus bond, would be irregular; but if the purchaser goes into possession, and so remains for five years, he is protected by the Act of 1804. 10 *Serg. & Rawle* 234; 8 *Watts* 364; 5 *Watts* 451. At all events, the plaintiffs were not entitled to recover without paying for the improvements. 1 *Serg. & Rawle* 38; 3 *Watts* 106; 8 *Watts* 435; 5 *Watts* 350; 2 *Watts & Serg.* 107.

*Cooper* and *Frick, contra.* The property was forfeited unless the traitor surrendered himself. This was an affirmative act, which must be proved; there was no legal presumption about it. 1 *Yeates* 287. The recitals in the deed from the commonwealth are evidence of the facts. 2 *Serg. & Rawle* 486. The want of a surplus bond is fatal to the defendant's title. 8 *Watts* 364; 6 *Watts* 416; 9 *Watts* 300. And the Act of 1815, which was intended to be, and is, a perfect system of itself, for the sale of unseated lands, virtually repeals the Act of 1804.

[Ash v. Ashton.]

The opinion of the Court was delivered by

KENNEDY, J.—In regard to the first error, it is contended by the counsel for the plaintiffs in error, that the deed of conveyance from the State was inadmissible because no attainder was shown. That it being the duty of Alexander Bartram to surrender himself and take his trial according to the requisition contained in the proclamation, it was therefore to be presumed that he did do so, until the contrary was proved. Such a presumption, however, would not only be contrary to the rule of law which makes it incumbent upon the party alleging compliance or performance to prove it, but likewise contrary to the general practice, at all times, of those who become fugitives from the criminal justice of their country. It is rare indeed that any such feel themselves bound to return and put themselves upon their trial. But if any one does do so, a record of it is invariably made. Indeed, it must be made, so that he, or any others interested in showing the fact of his return and his taking his trial, can easily do it, by producing the record made thereof, or a certified copy of it. The admission of the evidence was also objected to because no registry of the attainder was shown. But the proclamation and the Act of Assembly on the subject were produced, and they are a sufficient registry of the attainder, so far as regarded the party himself, his heirs or assigns, in the absence of proper evidence proving that he did return, as required by the proclamation, and abide his legal trial.

The registry required by the 7th section of the Act to be made of the names of persons attainted or to be attainted of high treason by virtue of the Act, and of all their real and personal estates and interests vested thereby or otherwise in the State by reason of such attainder, was evidently intended for the benefit of such as might have claims to or upon such estates. The 9th section of the Act seems to show, pretty clearly, that this was the main object of it, by making it the duty of the President or Vice-President and council, to cause the registry, or a copy of it, to be kept by the secretary open for public inspection, and directing him to transmit copies of it to the Justices of the Supreme Court or one of them; also to the sheriff of the county within which any forfeited real estate was situate, which was to be open to the inspection of every person; so that all persons having claims to or upon such estate might, agreeably to the 14th section of the Act, file the same, if against the personal estate, in the secretary's office, within three months from the date of the entry of the registry kept by him; and, if against the real estate, within six months from the entry of the registry to be kept by the sheriff of the county where such estate lay; in order that their claims, if just, might be allowed or satisfied; or if not filed within the term prescribed, the consequence would seem to be that they would be lost. But this being the real object of the registry required by the Act, a neglect to make it could not be necessary to vest in the State a right to

III. — 65

[Ash v. Ashton.]

the estates of those attainted under the Act of high treason, nor yet devest the State of such right after having vested.   A neglect, however, to make such a registry, and to deposit and forward copies of it, as directed by the Act, might leave the estates forfeited subject to the rights of all those having claims to or upon the same, in the hands of the vendees of the State.   This would seem to be the most that could result from such neglect on the part of the State.

It is also further objected, that the land was not taken and sold by the State, until after the treaty of peace was concluded between the United States and Great Britain, the 6th article of which declares "that there shall be no *further confiscations* made, or any prosecutions commenced against any person or persons, for or by reason of the part which he or they have taken in the present war; and that no person shall, on that account, suffer any *further* loss or damage, either in his person, liberty, or property; and that those who may be in confinement, on such charges, at the time of the ratification of the treaty in America, shall be immediately set at liberty, and the prosecutions so commenced be discontinued." But the attainder of Bartram had taken place upwards of five years before the making of this treaty ; and his estate, within the State, not only became forfeited immediately upon his attainder, but vested in the State, according to the express provision in the close of the 5th section of the Act, " without any office or inquisition thereof, thereafter to be taken or found," so that the 6th article has no application whatever to this case.   *Dietrick* v. *Mateer*, (10 *Serg. & Rawle* 153).   We therefore consider the evidence admissible.

The first question raised by the second error is, whether the five years' limitation, contained in the Act of 1804, is still in force or not; for if it be, it would seem to be applicable to this case, and would form a bar to the recovery of the plaintiffs.   The defendants claiming, as we have seen, under a county treasurer's sale of the land, for taxes assessed on it, and having been in the possession of it, under such sale, upwards of five years previously to the bringing of this action, would seem to be entitled to protection in their possession, even under the most unfavourable construction for them that could well be given to the Act.   The words of it are, " no action for the recovery of said lands shall lie, unless the same be brought within five years *after* the sale thereof."   In this case 18 years had elapsed *after* the last sale of the land for taxes, before this action was brought; but the defendants were willing to waive all that portion of the 18 years, during which they and those under whom they claimed, were not in the actual possession. This certainly was granting all possible indulgence to the owners of the land at the time of the sale for taxes, that the Legislature could have intended; and indeed, I think, more than was intended, if the language of the Act is to be regarded as truly indicative of

their intention in this particular; for it declares expressly that no action, for the recovery of the land, shall lie by him *after* five years *from the sale.* I am inclined strongly to believe, that the design of the Act was, if the purchaser at a tax sale took possession of the land within five years thereafter, that then the owner at the time of the sale, should bring his action within the five years; or if the purchaser did not take the possession within that period, then the owner should be bound to do so, otherwise his right to the land should be for ever gone. The opinion of the late Chief Justice Tilghman was, that the five years commenced running from the date of the sale for taxes. *Parish* v. *Stevens,* (3 *Serg. & Rawle* 298). But this opinion was afterwards overruled by this court, in *Waln* v. *Shearman,* (8 *Serg. & Rawle* 357), where it was settled that the five years did not commence running until actual possession was taken by the purchaser at the tax sale, or by some one claiming under him.

But it is contended here, that the Act of the 13th of March 1815, entitled "An Act to amend the Act, entitled 'An Act directing the mode of selling unseated lands for taxes, and for other purposes,'" has annulled the limitation of five years, contained in the Act of 1804. There is certainly no express repeal of this limitation of five years in the Act of 1815; but these Acts, being in *pari materia,* must therefore be considered as one Act only; and if it be that the Act of 1815, seeing it is the last will of the Legislature on the subject, contain in it anything repugnant to or inconsistent with the limitation clause of five years in the Act of 1804, it must be considered as a virtual repeal of the former in that particular. Or if any parts of the Act, to which the Act of 1815 is a supplement, or any other Act, be altered or supplied thereby, they are expressly repealed by the last section of it. The 4th section of the Act of 1815, seems to be the only part of it which has any bearing upon the question here. By this section, the owners of lands sold for taxes, are allowed two years after the sale thereof, whether the sale be good or not, to redeem their lands, by paying or tendering to the county treasurer the amount of taxes for which the lands were sold, and the costs incurred thereby, together with the additional sum of 25 per cent. thereon; and if the county treasurer shall refuse to receive the same, or the owners of the lands sold for taxes shall have paid the taxes previously to the sale, they, in either of these cases, but in no other, shall be entitled to recover the lands by due course of law. In all the cases where the owners of lands, sold for taxes, are deprived of them by this section, unless they make a tender of the amount of the taxes, &c., as therein mentioned, within two years after the sale thereof, the limitation of five years must be considered as altered and supplied; because the owners, instead of having five years allowed them to assert their claims to the land, have only two, which is certainly a very material alteration.

[Ash v. Ashton.]

In respect, however, to a case coming within the limitation of five years, mentioned in the Act of 1804, but not embraced within the provision of the Act of 1815, allowing only two years, there seems to be no reason why it should be considered as affected by this latter Act, because the alteration made thereby does not extend to it; consequently it remains as it did, under the Act of 1804, before the passage of the Act of 1815.

The case now under consideration, is not a case where the sale for taxes has been avoided by a tender of the amount of taxes, &c., under the 4th section of this latter Act, to which the limitation of two years is made directly applicable; but is a case of a sale for taxes, considered void under the provisions of the Act of 1804, inasmuch as no bond was given by the purchaser to the county treasurer, in conformity to the requisition of that Act, for the surplus of the purchase money, after paying out of it the taxes and costs.    And that the sale, in such case, is void for want of such bond being given, and the owner of the land at the time of the sale, entitled to recover it, was settled in the cases of *Sutton v. Nelson*, (10 *Serg. & Rawle* 238), and *M'Donald* v. *Maus*, (8 *Watts* 364), notwithstanding the clause in the 4th section of the Act of 1815, which declares that the owners of lands sold for taxes, shall be entitled to recover in the case of a tender of the amount of the taxes, &c., as already mentioned, and where they shall have paid the taxes previously to the sale; "but *in no other case*, and *on no other plea*, shall an action be sustained."    But it appeared plain, from the Act of 1815, that the Legislature did not intend to deprive the owner of the land of that security for the payment of the surplus money coming to him, which was afforded by the Act of 1804, by its making the bond, taken for the payment of it, binding upon the land as effectually and in like manner as a judgment, into whose hands or possession soever it might come. And hence it became necessary, either to declare the sale void, or otherwise leave the owner of the land at the time of the sale, without that security for the payment of the surplus money, which the Legislature, by the Act of 1804, expressly intended he should have, and which they certainly did not intend, by the Act of 1815, to take away.    But as it was owing to the default of the purchaser, that the bond was not given, it was held reasonable and right that the owner should recover his land in place of it.

But, then, it is proper to observe here, that if the bond had been given, the owners, or plaintiffs below, could only have made it available, according to the express terms of the Act, by causing an action to be entered on the docket of the prothonotary, in whose office it ought to have been filed, *within five years after the sale of the land.*    Is there not, then, great propriety in saying, that they ought not to be permitted to recover the land, after the period has elapsed within which they would have had a right to have proceeded on the bond, had one been given and filed?    It is,

[Ash v. Ashton.]

perhaps, not easy to discover any good reason why they should be allowed a longer time to proceed to recover the one more than the other; for as regards the owners at the time of the sale, the loss is the same to them; but as regards the interests of the State, the application of the limitation of five years, in order to bar a recovery of the land by the owners, may be very important. As regards the peace and quiet of the community, it would seem to be expedient that it should be applied; and as regards the wealth of the State, it would not be less so; because a protection to those in possession of the land, by the application of such a limitation, would be a great inducement with them to improve and render it much more productive and valuable than otherwise they would be likely to do. But seeing the Act of 1815 does not affect or touch this case, and seeing the Act of 1804 does in plain terms do so, we are of opinion that it comes fairly within the limitation of five years, contained in this latter Act; and that the court below ought, therefore, to have permitted the defendants there to have given the evidence offered by them, and mentioned in their second bill of exceptions.

Judgment reversed, and *venire de novo* awarded.